UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Larry Alan Burns, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. 14-CR-03118-LAB |
| | ) | |
| ███████████, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

San Diego, California
Monday, June 1, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

LAURA E. DUFFY
United States Attorney
880 Front Street, Room 6293
San Diego, California 92101
**BY: LAWRENCE A. CASPER, ESQ.**
**ASSISTANT UNITED STATES ATTORNEY**

For Defendant:

LAW OFFICES OF KURT D. HERMANSEN
550 West C Street, Suite 580
San Diego, California 92101
**BY: KURT DAVID HERMANSEN, ESQ.**
**ATTORNEY AT LAW**

Reported By: James C. Pence, RMR, CRR, CSR No. 13059
Official Court Reporter

<u>**Monday - June 1, 2015**</u>                                    <u>**9:39 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

---o0o---

    **THE CLERK:**  Calling Number 4 on the calendar, 14-CR-3118, United States of America versus ███████ ███.

State your appearance, please.

    **THE COURT:**  Good morning.

    **MR. HERMANSEN:**  Good morning, Your Honor.  Kurt Hermansen on behalf of ██████.  My apologies for the late filing.

    **THE COURT:**  Okay.  I had a chance to look at it, Mr. Hermansen.

    **MR. CASPER:**  Good morning, Your Honor.  Larry Casper for the United States.

    **THE COURT:**  Good morning.

Did you get a copy of Mr. Hermansen's filing?

    **MR. CASPER:**  I did, and I haven't had a chance to skim through it.

    **THE COURT:**  You have or you have not?

    **MR. CASPER:**  I have not had a chance to skim through it, but --

    **THE COURT:**  All right.

    **MR. HERMANSEN:**  And, Your Honor, I would have no objection to pushing it over a week if the Court needs more

time.  I do apologize for that.

        **THE COURT:**  No, I don't.  I've had a chance to look at it.  I even -- that's why I was a little late this morning taking the bench.  I read it and marked it in some places.

                    (Pause in proceedings.)

        **THE COURT:**  Tish, there's a -- for some reason, the order that I wrote on this originally didn't come up.  Can you pull it up in this case?  It should be an order that I wrote.

        **THE CLERK:**  An order?

        **THE COURT:**  Yeah, on this case.

        **THE CLERK:**  Okay.  All right.

        **THE COURT:**  Just print it out for me, please.

        **MR. CASPER:**  Your Honor, just to help Tish, it's Document 44, and if the Court wants, I have a copy of the order.

        **THE COURT:**  Let's see if she found it.

        **THE CLERK:**  "Order Denying Motion to Strike"?

        **THE COURT:**  Yeah.

    So ███████is present.

    Good morning.

        **THE DEFENDANT:**  Good morning.

        **THE COURT:**  This matter is on for sentencing this morning.

    As a preliminary matter, the Court received documents today asking once again to seal docket entries, to redact

1   docket entries, and to follow a local rule, 32.1.

2      The offering by Mr. Hermansen contained a proposed order

3   and asked that I agree to file his document under seal, which I

4   will. I find that the document that he filed advocating for

5   taking the actions of sealing and redacting the docket entry

6   contains confidential information that ought not to be made

7   public at this point.

8      However, Mr. Hermansen, I'm happy to hear further from

9   you. I think I have your position completely. As I said, I

10   have read the document. I have reviewed this now twice. I

11   issued an order on the first what you referred to as a Kurt

12   motion. If you have anything else to say on it, I'm happy to

13   hear from you.

14      **MR. HERMANSEN:** I -- I think the Court can tell I took

15   quite a lot of time writing and editing this. So unless the

16   Court has any questions, I think it's -- I mean, it's 20 pages.

17      **THE COURT:** The Government hasn't joined in this

18   motion; correct, Mr. Casper?

19      **MR. CASPER:** We have not. We first saw this motion

20   this morning. So --

21      **THE COURT:** Okay. And you've not otherwise made a

22   similar motion?

23      **MR. CASPER:** We have not at this point, Your Honor.

24      **THE COURT:** Okay.

25      **MR. HERMANSEN:** Well, would the Court hear from me at

sidebar briefly or --

**THE COURT:** Well, I -- maybe you can keep it generalized. I'm reluctant to hear it sidebar more. I mean, I have your papers here.

**MR. HERMANSEN:** Yeah. It would just be a general argument.

**THE COURT:** Okay. Well, I mean, I have it. Is there anything beyond what is contained in your papers? I've read that carefully. As you mentioned, it's 20 pages long.

**MR. HERMANSEN:** No, Your Honor.

**MR. CASPER:** And, Your Honor, I would just note that our position, I think, is set forth -- while not specifically on this motion, is set forth in our sealed filing.

**THE COURT:** Right.

All right. So let me -- let me identify what the issue is here. I think the Government has filed a sentencing summary chart public -- publically pursuant to the Court's order that it do so unless it can show compelling reasons why a sentencing summary chart should be filed under seal.

Sentencing summary charts are part of the sentencing process. They're required. They go hand in hand with the calculation of the defendant's sentence and guidelines, and the Supreme Court and the Ninth Circuit have both held that documents that are attendant to sentencing are presumed -- presumptively open to the public unless compelling reasons are

shown why they should not be.

I've given both the defendant and the Government the opportunity to convince me that there are compelling reasons that the sentencing summary chart in this case along with other documents ought not to be filed publically.  The Government has declined to request that, has not asked me to do so.  In fact, their first filing, which prompted Mr. Hermansen's motion, was a public filing of their sentencing summary chart and their motion.

Pursuant to the usual rule that I follow, unless the Government or the defendant convinces me that it ought not to be followed, I did seal the motion -- or excuse me -- the declaration in support of the Government's 5K motion.  I did not seal the 5K motion.  I believe those actions are required under Ninth Circuit and Supreme Court precedent.  I don't think there's any such thing as automatic sealing when there's a 5K motion.

I think instead that the proponent of the sealing must comply with the three-part showing that I mentioned in the original order that I filed denying Mr. Hermansen's motion to strike; that is, the proponent of nondisclosure must show that disclosure will cause irreparable harm or that some other compelling interest is at stake.

Second, that there's no alternative to nondisclosure that will adequately protect the right or interest at stake; and

1    3.  That nondisclosure will adequately protect against the

2    perceived harm.

3         The Court, in analyzing that with respect to the motion to

4    strike the sentencing summary chart and -- and sort of rewrite

5    the docket entries to camouflage the fact that the Government

6    was seeking to reduce the defendant's sentence based on his

7    cooperation, found that none of those three showings had been

8    made.  And I have reviewed, again, the renewed argument in

9    Mr. Hermansen's papers.

10        First, let me say I understand, Mr. Hermansen, your

11   motive.  You're trying to protect your client as you see fit

12   and as your perceptions lead you.  I don't doubt your

13   earnestness in any of this.  So that's not implicated here.  I

14   think you're acting in good faith what you believe to be your

15   client's interests.

16        But you point out that neither you nor the Government are

17   aware of any specific threats to the defendant.  There's no

18   specific threats to family members.  The fact that he may

19   continue cooperating is just that, a possibility.  It's not

20   clear at all that he is.

21        You acknowledge, I think, the Court's point, that the

22   Court is required as a matter of sentencing, again, unless

23   extraordinary circumstances are shown, to first correctly

24   calculate the guidelines and to explain the guideline

25   calculations to promote review of the Court's sentence.  The

Ninth Circuit has been very clear that that includes departures

and that -- in fact, an en banc court in *Carty* said that the

Court must explain any basis for a departure in its sentencing

allocution.

So, again, I don't foreclose that maybe, you know, some

level of generality may be warranted in a particular case, but

none is warranted here that I can see, particularly on your

first motion.  There was nothing in support of it.  The second

motion fills in the gaps a little bit.  But the problem I have

is that, you know, once the information is made public in a

public forum like a sentencing, then it's very hard to say,

"Well, then other references to it, for example, docket

entries, need to be sealed."

I cited two cases in my original order that said unless

the cat's out of the bag, republication will very rarely -- in

fact, I can't find a case where republication has risen to the

level of a compelling interest in sealing after -- after

something has been made public --

**MR. HERMANSEN:**  Your Honor --

**THE COURT:**  -- and you seem to concede that.

**MR. HERMANSEN:**  Well -- but the cat doesn't have to be

out of the bag in docketing entries.  It's completely

surplusage to put it in there.  It's unnecessary.

**THE COURT:**  No, it's not -- it's not surplusage, and I

cited reasons why it's not surplusage.  The Court's sentencing

calculations must be specific, and any deviation, including

departures from the guidelines, must be explained.

**MR. HERMANSEN:** Right, but --

**THE COURT:** Their --

**MR. HERMANSEN:** -- that's not a docket entry from the

Government. The Government --

**THE COURT:** It's not a docket entry. The point is

that it's made public in a public forum. We now have what, a

dozen, two dozen people in court now?

Now, I understand your point that there's a difference

between coming to court in a noncelebrated case where nobody is

really paying attention and then examining a docket entry, but

you run right up against the problem that this has been

mentioned once before. It's been mentioned in public, and it

makes it all the more difficult to meet the compelling

interests standard when something has already been made

public --

**MR. HERMANSEN:** Right, and I respect --

**THE COURT:** -- in the fact of a 5K here without regard

to what the defendant did, what he said, which has been sealed

and will not be mentioned during this sentencing today, has

been made public.

**MR. HERMANSEN:** And I respect that the Court values

the public's right to know. I respect that very much.

**THE COURT:** I do, and let me -- let me tell you for a

minute why so you understand my thinking on this, that it's not just knee-jerk or it's not just kind of mindless or blind trying to follow, you know, something that I maybe don't really agree with or I'm indifferent about. I'm not indifferent about this. All of us are the products of our own experience.

In 1985, I was assigned to prosecute a very infamous murder case involving six defendants who killed a marine staff sergeant up in the North County. You may remember this case, the Troiani case. It was a capital case. Each defendant had been assigned two defense counsel. The preliminary hearing in the case lasted three months. At the time, this was before *Press Enterprises* decided there was a Penal Code provision, 868, that allowed the defendant -- counsel for the defendant to ask that the preliminary hearing be closed for any reason, and the defendants invoked that proceeding.

So for three months, we had a secret judicial proceeding behind closed doors with the doors locked. Judge Huff was a lawyer with Gray Cary for the Copley Press. She was at the door many times knocking, objecting to the closed proceeding.

There was a community that was interested in what was going on. This was an outrageous thing that happened, and they wanted to know about the processes of justice. They wanted to know that the courts were responding appropriately, that the DA was responding appropriately. They wanted to hear evidence about what happened, but they were denied that opportunity.

1    As it turns out, the denial was unconstitutional.  A year

2  or two later, the Supreme Court decided *Press Enterprise* and

3  declared 868 unconstitutional, but I thought to myself as a

4  young lawyer at the time that this was just wrong.  I mean, I

5  was under a gag order, and for three months, as I said, a

6  beckoning public that wanted to know what was going on was

7  deprived of that opportunity.  I had no doubt in my mind at the

8  time that it was wrong under the First Amendment, and that view

9  was later vindicated by the Supreme Court.

10    So for me, you know, that kind of formed my thinking about

11  the necessity of public proceedings, and sentencings are public

12  proceedings.

13        **MR. HERMANSEN:**  Right, and I --

14        **THE COURT:**  Now, that's not to say -- that's not to

15  say that there's never a cause for sealing something.  As I

16  mentioned, I routinely seal the declarations.  They contain

17  sensitive information that the Government doesn't want to know

18  out, even -- know -- want out, even if it leads nowhere.  And I

19  think, you know, that's the gist of this, is sealing that.

20    But in the absence of some specific threat to the

21  defendant or to his family, to say that all 5K references

22  should be sealed is just wrong.  It's contrary to the law.

23        **MR. HERMANSEN:**  Well, there's apples and oranges here,

24  though.  The first thing is docket entries, and the docket

25  entries don't need to say "5K1.1."  That is what first lets the

cat out of the bag.  That's, like, this permanent thing that anyone can look at from anywhere in the world.

**THE COURT:**  But here's -- here's what the Ninth Circuit has said to that.  "Confidence in the accuracy of court records is essential for a court and for the authority of its rulings and the respect due its judgments.  Such confidence erodes if there is a two-tier system, open and closed.  If public records cannot be compared with sealed ones, all of the former are put in doubt."

This comes from *United States District Court v. Central* -- excuse me -- *CBS v. U.S. District Court for the Central District of California* at 765 F.2d, 823, and the author of this was then-Judge/now-Justice Anthony Kennedy.

Here's what else he says in this case that I find controlling here.  First, he notes that there's a presumption of openness to records, including sentencing records.  In this case, it was -- it was a Rule 35, it was post-trial, and he says, "No difference there."  He describes the interest that has to be -- has to be shown to override the presumption.

"The interest that overrides the presumption of open proceedings must be specified with particularity, and there must be findings that the closure remedy is narrowly confined to protect the interest."  He goes on to say, "In this case, you know, we can't find it."  This was a cooperation case, too. "We're unable to identify the interests with specificity or

find them compelling to conclude that sealing the document
would vindicate them.

"The Government's interests in law enforcement are
implicated in this case, but most of the information it seeks
to keep confidential might easily be surmised from what's
already in the public record," which -- again, as I said, if
someone follows the proceeding here, they would know that
there's a 5K motion that's been made that the Court intends to
grant.

He goes on to define the general -- excuse me -- the
character of the showing that must be made.  "General
representations concerning the propriety of reducing a sentence
are not adequate."  And he lists a number of alternative
measures that a court must consider before sealing, among them
sidebar conferences on sentencing matters, excising
documents -- or from documents names and transactions and even
this, the use of a witness protection program.

     **MR. HERMANSEN:**  But if I can stop you there, he says
"sidebars," Your Honor.  So that --

     **THE COURT:**  Right.  Right.

     **MR. HERMANSEN:**  -- is an option that this Court could
do and should do --

     **THE COURT:**  Yeah, but, again --

     **MR. HERMANSEN:**  -- and then the cat is not out of the
bag.

1          **THE COURT:**  It's based on -- it's based on a

2    compelling showing or there being a compelling showing.

3    General representations are not enough.  It's telling --

4          **MR. HERMANSEN:**  Yeah, but it's short of -- it's short

5    of saying -- so Justice Kennedy suggests sidebars short of

6    sealing.  There are other measures that the Court can take.

7          **THE COURT:**  He suggests that as an alternative to

8    sealing in the appropriate case where the representation is

9    sufficient, but I find here that his reference to use of a

10   witness protection program as an alternative to creating the

11   sealed record really defines the nature of the openness and the

12   showing that must be made.  You haven't mentioned anything

13   about that or the propriety of that in this case, nor has the

14   Government even mentioned it.

15         **MR. HERMANSEN:**  Right, but those are incredibly

16   costly.  He has a wife and kids, and to completely change

17   someone's life or to make them be in administrative segregation

18   is something that should -- we should try to avoid.  The way

19   it's --

20         **THE COURT:**  I would -- if I thought -- if you had made

21   such a showing, then I would certainly consider that.

22         You say at Page 7 that you, quote, "are not aware of any

23   specific threats of harm."  You go on to say that they may try

24   to retaliate against the defendant or his family.  That is

25   entirely speculative.  There's nothing at all.  I mean, that

can be said in every case where there's a 5k, that there's a

possibility that someone who's tattled on would want to

recriminate or retaliate against the tattler.

     **MR. HERMANSEN:** Which is -- but that's -- we have the

local rules. It's kind of like a TRO. Be safe, don't put

people in danger, and then --

     **THE COURT:** Yeah.

     **MR. HERMANSEN:** -- let's hear from both parties.

     **THE COURT:** To the extent the local rule is

inconsistent with the constitutional and case precedent, I

don't -- would not follow it. And you're -- you know, you're

suggesting a construction that says every time there's mention

of, you know, 5K, it has to be sealed, but I disagree with

that. That's not consistent with the case law. It just isn't.

     So with all respect, Mr. Hermansen, I don't -- you know,

I'll seal your pleading. As I said, your pleading contains

nuts and bolts and confidential information as to why you think

it ought to be sealed and contains other information that ought

not to be made public. That's a sensible thing here.

     This is very different from the case that you rely on in

which I was also the judge. Here, I've sealed the Government's

declaration, and I've sealed your declaration. It's not so

much a declaration as it is incorporating information that

ought not to be public. I think that protects the defendant to

the extent that I can see protection is necessary. Beyond

1    that, no showing has been made to me.

2        It's significant that the Government doesn't perceive the

3    threat the same way you do.  They haven't asked for any further

4    protection.  They haven't.

5            **MR. HERMANSEN:**  Well, they're --

6        **THE COURT:**  And they don't today.  I mean, I just

7    checked with Mr. Caplan [sic].  He says, "No, we're not" -- "we

8    have not made such a motion."

9            **MR. HERMANSEN:**  That's why we have defense attorneys.

10   I'm more concerned about my client's life --

11           **THE COURT:**  Well, as I said --

12           **MR. HERMANSEN:**  -- and it's curious to me -- it's

13   curious to me that they're -- the Government -- you know, I

14   know he doesn't object to my motion.  He can speak for himself,

15   but it also has a deleterious effect on the Government because

16   I can no longer say to any of my clients -- if it says LAB on

17   the case, I can't say to them, "Don't worry.  Cooperate with

18   the Government.  They'll protect you."  I can never say that

19   again.

20           **THE COURT:**  Well, if what you want to say to your

21   clients is in every case where you cooperate, that cooperation

22   will never become known to anyone and other judges are doing

23   that, then shame on them.  Shame on them.

24       So if you want to specify and say, "Well, LAB is the only

25   one doing this," then I would say to that, "LAB is following

the law."  I don't agree with your general proposition that if a guy gets 5K credit that the fact that he's getting that credit may not be known in all circumstances.

Look, you and I both know that most of the time, the 5K credit is given for information that goes nowhere in this district, goes nowhere.  That's been my anecdotal experience. I look at the declarations.  I don't think there's been a case where I haven't gone along with it even to the extent that the Government asks for it because I think in the first instance, I'll defer to them.  They know the case better.

But I have to tell you, you know, in my heart of hearts and using my intellect, I look at it -- and not this case, but I see cases where Juan said this, we don't know Juan's last name, and he met at Miguel's Tire Shop down in Mexico.  Well, I don't know if there's a Juan or a Miguel's Tire Shop or whether it had anything to do with -- a lot of times, I think the story is made up, but the Government says, "Oh, this adds to the bank of information that we have, and it's helpful," and so I sign off on it.

Now, there's no prospect of retaliation in a case like that -- none -- and yet, you know, you suggest that because 5K is mentioned that it ought to be sealed.  I don't see any reason for it.  I think it's just silly.  It's perpetuating a lie.

        **MR. HERMANSEN:**  Well, that's not my argument, though.

My argument is that a balancing should take place, and a prudent and careful procedure consistent with the local rule, which, in my opinion, is consistent with the constitutional requirements of public access, is, you know, don't shoot first and ask questions later.  Ask all the questions.  Collect all the information.  Hear from both sides.  Don't be reckless and include things like 5K1.1 in the docket when it's not necessary, and --

**THE COURT:**  I don't see that as reckless, and, you know, neither does the Ninth Circuit or the Supreme Court.  The Ninth Circuit has said -- the Supreme Court has said in *Press Enterprise* access to two documents may be denied only when there's been a showing that nondisclosure, quote, "is strictly and inescapably necessary," end quote, to protect a compelling interest.  You've not made that showing here.

**MR. HERMANSEN:**  Right.  I think maybe the words I'm using -- the Court -- because the procedure has changed greatly since you were a U.S. Attorney.  We as attorneys now have to type in what's in the docket.  It used to be a function of the Clerk's Office.  They would type in a description of the document.  We now as attorneys type in what we're filing.

So we can type in, "I'm now filing a motion for downward departure."  We don't have to type in, "I'm filing a motion for downward departure under 5K1.1."  What happened in this case was the U.S. Attorney's Office typed in that extra stuff, which

1    is now available to anyone on PACER, anyone anywhere in the

2    world.  I can pull it up on my phone right now --

3            **THE COURT:**  Right.

4            **MR. HERMANSEN:**  -- and see "5K1.1."  That's what I'm

5    talking about is surplusage.

6            **THE COURT:**  What do we do that -- you know, I've

7    mentioned this to you several times.  You haven't responded to

8    it.  They've also filed publically a sentencing summary chart

9    which asks me explicitly to give credit under 5K1.1 --

10           **MR. HERMANSEN:**  There --

11           **THE COURT:**  -- to depart.

12           **MR. HERMANSEN:**  I understand, but there's more --

13           **THE COURT:**  So what's the difference if their motion

14   says, "We're making a motion under 5K" and it's reflected

15   there?  Moreover --

16           **MR. HERMANSEN:**  There's an important distinction.  I

17   want to answer your question.

18           **THE COURT:**  Well, there's one other thing I want you

19   to consider.

20        Moreover, as I point out, the Ninth Circuit has held that

21   the public generally has a right to look at the plea

22   agreements.  In this plea agreement, as in every one, the

23   sentencing guideline calculations are agreed upon by the

24   parties as set forth, including the 5K departure.  I've looked

25   at it.

So there's two documents here that the public presumptively has a right to that mention 5K1, and you say, "Well, but we should still seal the document" -- or "the docket or camouflage the nature of the entry," even though that information is known by someone looking through.

MR. HERMANSEN: No, I'm not -- okay.

So the difference between a docket entry is I can pull it up on my phone right now and see it says "5K1.1" in the docket entry, the little typed-in text. I cannot as a member of the public click on a sentencing summary chart. I have to walk into the Clerk's Office, and then I can look at it in the Clerk's Office.

So it's limited access. It's not black and white where it's either under seal or it's not under seal. There are varying levels of protection. The greatest level of protection is under seal, but there are lots of lesser protections that the Court can put in place, and they're already in place. One of them is the local rule. One of them is the sentencing documents. The PSR is not available to the public.

THE COURT: Right, but that's clear by statute.

MR. HERMANSEN: And there are good reasons for it.

And sentencing documents -- it's the same thing. They're somewhat protected. If the press wants to walk into the Clerk's Office and look at a plea agreement, they absolutely can. If they want to walk in there and look at sentencing

documents, they can.  But they can't click on the sentencing

summary chart and see "5K1.1."

      **THE COURT:**  So you're asking me to take an affirmative

act of sealing those or redacting those or camouflaging them.

I've cited two cases at the end of the original order, one from

the Fourth -- both from the Fourth Circuit, *Virginia Department*

*of State Police v. Washington Post* and *In Re Charlotte*

*Observer*.

      In both of those cases, the Court says once the

information is available, the character -- the secret character

is lost.  And the other one says that once information is made

public -- and in this case, you acknowledge that somebody

walking in and looking at the docket would see the 5K entries

and that that's not protected -- that there's insufficiently

compelling reason to overcome the First Amendment right of

access.

      How do I then say, "Well, I'm going to do what you've

asked me to do, this hybrid blocking of some things" when you

acknowledge that other things are legitimately open to the

public?

      **MR. HERMANSEN:**  So if the PSR were accidentally

available to the public, the Court would still have to say,

"Let's fix the mistake.  Let's put it so that it's not

available to the public."

      **THE COURT:**  Right.

1    **MR. HERMANSEN:** Accidents like that happen or

2 something that should be sealed is accidentally unsealed.

3    **THE COURT:** I don't see this as an accident, though.

4 I mean, in that case, as I said, there's statutory protection,

5 a statutory reason that we seal probation reports. And if one

6 were inadvertently opened, that would go against the general

7 rule.

8    Here, the general rule is opposite. Things are supposed

9 to be open unless a compelling reason is shown, and as I've

10 said several times now, I just don't find any showing of

11 compelling reason with any particularity. It's all based on

12 speculation, and you as much as acknowledge that in your

13 papers. You can't give me any specifics at all. It's framed

14 in terms of "may" and "possibilities" and this and that.

15 That's not enough. It's clearly not enough to meet the

16 standards as articulated in these cases.

17    So I -- as I said, I don't question your zealousness, your

18 earnestness about this. We have a, I hope, respectful

19 disagreement on this. I find that the motion must be denied,

20 and I do deny it.

21    Again, let me summarize what is being, I think, sensibly

22 withheld from the public. Any mention of what the defendant

23 said or the value of that in the eyes of the Government has

24 been withheld, and I don't intend to mention any of that other

25 than by a general reference today. To the extent you alluded

to that is the reason that I sealed your motion in support --
renewed motion in support of striking or changing the docket
entries.  But beyond that, the record is open to the public as
I find it's required to be under both Ninth Circuit and Supreme
Court precedent.

Now, let's turn to the sentencing.  I have read and
considered the presentence report.  Have you gone over that
with ██████████?

          **MR. HERMANSEN:**  ██████████.  Yes, Your Honor.

          **THE COURT:**  Is your ██████████?  Is that what
it is?

          **THE DEFENDANT:**  Yes.

          **THE COURT:**  Oh.  Okay.  ██████████, then.  I
apologize.  I thought that was the ██████████████████.

So that's the first thing I read.  I also read the
Government's motion for -- looked at the Government's motion
for downward departure, and I have read the affidavit, the
declaration by Mr. Casper, in support of it.

You filed an amended sentencing memo, which I have read
and considered.  I saw the first one.  I read the amended one.
Both sides here have filed sentencing summary charts that I've
looked at.  You filed letters from ██████████ mother and
father, among others, then some Certificates of Completion.
I've looked at all of that, and then you filed an objection to
the presentence report.

1    Is there anything else that was filed that I have not

2   mentioned?  Of course, obviously, I've considered the papers

3   that you filed regarding sealing, and I've already spoken to

4   those.  But is there anything else that should have been

5   considered?

6       **MR. HERMANSEN:**  I believe the Court mentioned

7   everything.

8       **THE PROBATION OFFICER:**  Your Honor, Victoria Chalmers

9   for Probation.

10   You mentioned the objections.  Our office also filed an

11  addendum --

12      **THE COURT:**  Yes.

13      **THE PROBATION OFFICER:**  -- in response to those.

14      **THE COURT:**  I apologize.  I didn't mention that.

15  There is an addendum from Mr. Torres, and I have read that.

16   So let me deal with the objections first, Mr. Hermansen.

17   Okay.  You've filed an objection to the lack of a downward

18  departure, a recommendation for minor role.  The Court finds

19  first of all that that's not a proper objection.  Objections

20  are to facts, not to role recommendations.  You can certainly

21  advocate that.  I have your position, and I'll let you expand

22  on that that a role adjustment is appropriate in this case, but

23  it's not a proper objection under the rule.  The Ninth Circuit

24  has specifically dealt with that and said it doesn't fall under

25  the purview of Rule 32.

1  And I think that's it. It subsumes other objections you

2  have. If the role doesn't apply, then obviously the two points

3  for methamphetamine doesn't apply. If no role is given, then

4  that is a proper calculation. But I think that's the gist of

5  it, isn't it?

6  **MR. HERMANSEN:** Yes, Your Honor.

7  **THE COURT:** Okay. So, again, I don't find any

8  specific facts that you've mentioned, but I'm happy to hear

9  from you on that issue of role. I have to tell you that I

10  don't see it. I've looked over everything carefully. I'm

11  looking particularly at the Government's declaration at Page 8.

12  This is the declaration in support of their motion, the bottom

13  paragraph.

14  It appears that this was not the defendant's first

15  smuggling operation. Moreover, you know, you have given me a

16  statement of facts and relied on that in advocating role that I

17  don't find to be credible.

18  Here's what I find, that the defendant changed his story

19  several different times in material ways. It wasn't until the

20  very end that the compulsion part of it came up. I note that

21  even in the debrief with Government agents that they didn't

22  believe him the first time and confronted him, and only in a

23  subsequent interview with the agents did he then change his

24  story with material particulars.

25  I don't find that a reliable basis for crediting what he

1  says.  I don't in particular credit the last version.  I

2  don't -- I don't see that he was under any particular

3  compulsion.  It sounds like he invented that after the other

4  stories about noninvolvement failed.  And, you know, when he

5  does finally appear to come clean, he admits that he had done

6  this before.

7       Now, you know, the standard is that I have to find him to

8  be substantially less culpable than the average participant.

9  I'm aware that there are other participants in this, including

10  the recruiter.  But I'm also aware of other salient facts in

11  this instance -- this instance only, I'm talking about -- he

12  had 9.3 kilos of methamphetamine.

13       Mr. Casper, remind me what the net total of pure

14  methamphetamine was.

15            MR. CASPER:  It was -- it was 8-point -- I think --

16            THE COURT:  8.871?

17            MR. CASPER:  871, correct, Your Honor.

18            THE COURT:  So, you know, we're dealing,

19  Mr. Hermansen, with 20 pounds of pure methamphetamine.  We have

20  a fellow who's done this -- I don't know how many times, but

21  he's done it before.  He's being paid.  He brings his

22  three-year-old daughter along on this occasion.  Now, he may

23  have some other reason for doing it, but he knew what he was

24  doing.  I mean, this was the last place she should have been,

25  was in the car with him to see her father get arrested for

this.

I just don't see anything unaggravating about this that would cause a conscientious person to say, "Oh, yes, he's substantially less culpable than the average person that imports methamphetamine."

Now, if I'm wrong about that, this is your chance to persuade me on that.

**MR. HERMANSEN:** In looking at the Document No. 34, which is the addendum to the PSR, the probation officer cites three Ninth Circuit cases and then highlights the word "substantially less culpable than other defendants." My legal argument is that we -- and that is what the guideline says.

But when we're looking at sufficiency of the evidence, it's the same standard, substantial, whether there's substantial evidence, which just means some evidence, any evidence, to support the verdict. And given that the Ninth Circuit had -- I mean, the U.S. Sentencing Commission has repeatedly amended the guidelines to make it easier to give role. I think this word "substantially" should be given that same definition that exists in the sufficiency of the evidence context.

And there's just some -- some evidence that he's -- so it's substantially less culpable. So what does that mean? He is less culpable than the recruiter, and we know who the recruiter is in this case, and my argument is that --

1    **THE COURT:** I don't know where the recruiter is in the

2    hierarchy, though. As I read it, the recruiter is the fellow

3    with access to all the dope who not only makes the arrangements

4    but sees to it that the dope gets put in the car.

5    Now, if the recruiter were in front of me, I would fully

6    expect the Government would say he's a leader, organizer,

7    shot-caller, which means he's not an average participant. He's

8    up at the high end of the ladder. It's not an apt comparison

9    to compare him to the recruiter in this case, given what we

10   know the recruiter did and the access that he had. That's the

11   problem I'm having with it.

12   **MR. HERMANSEN:** Well --

13   **THE COURT:** You've heard this from me before, but, you

14   know, I envision this as a ladder of culpability with the

15   average participant being somewhere in the middle. To be

16   substantially less culpable, one needs to be down toward the

17   bottom end of the ladder. And the standard and the Ninth

18   Circuit has said the Court should look to people at the middle

19   of the ladder, the average participants, and say, "Is this

20   fellow beneath them?" And here, I just can't find that.

21   I mean, you have acknowledged *Hurtado* is the latest from

22   the Ninth Circuit on this issue, latest published decision.

23   This guy meets all the buttons on *Hurtado*. He was being paid,

24   he had a substantial amount of methamphetamine, and he engaged

25   in, you know, substantial preliminary acts. I mean -- and

*Hurtado* wasn't just the fact that the person allowed the car to
be registered in his name or participate in that.  It was the
fact that the person had engaged in preliminary conduct that
evinced, you know, planning and preparation for the penultimate
act of bringing it in.  And here, we have all three of those.

**MR. HERMANSEN:**  Yeah.  I think the test is totality of
the circumstances, not looking at "Oh, well, here's" -- "he's
done it twice; and therefore, no minor role."

**THE COURT:**  Right.  I mean, I -- it would be a hard
case for me to say somebody has got a minor role who has
repeatedly done it before.  That's -- I'm not focused on that.
I'm focused on, you know, kind of a triple-whammy here.  He's
being paid, he's got a large amount of narcotics, and he's done
it before.

And then the additional aggravator, which, to me, you
know, shows or demonstrates some cynical behavior on his part
to have the daughter along.  I mean, you haven't asked for any
kind of adjustment for that, for willfully involving a child.
And I'm not telling you that I'm going to depart on that basis
or adjust on that basis, but I can't see any reason why he
would have his daughter and what -- the mother of the child in
the car with him when he knew what he was doing.

I mean, he had done this before.  It wasn't a surprise to
him.  There could be no reason to have them along.  I mean,
even if there was some ostensible other good reason -- you

know, they're shopping, they're doing something like that -- he
should have said, "Not this time.  I'll come back and get you,
but I've got something I've got to do beforehand," something
like that.

I can only conclude that their inclusion in the car was
because he wanted to try to allay suspicions of the border
guard by making it look like this was some family outing with
him and the child and the mother, you know, crossing the
border.  I mean, I'm really -- I'm searching to find anything
that would, you know, allow me to fairly say that he had minor
complicity in this.

**MR. HERMANSEN:**  I'll submit.

**THE COURT:**  All right.  The objection, such as it is,
to minor role is denied.  The Court finds the defendant did not
have a minor role.  I make that finding under clear and
convincing evidence.

So I'm happy to hear from you generally on behalf of
██████████.

**MR. HERMANSEN:**  Your Honor, the Court has read the
letters, and I would just like to highlight a couple things.
First is there are two Certificates of Completion regarding AA.
It's not clear from the certificates what they are.  So I
wanted to explain that to the Court.

One is Mapping Your Steps.  So that's, like I said, a
12-step program.  So he was -- he did that at CCA on his own.

And Mapping Your Traditions is another part of that AA training that he's getting at CCA because part of what -- I mean, two things motivated the offense.  One is he's been struggling with alcohol, marijuana, and the worst, of course, is methamphetamine.

So I think a really important outcome here would be RDAP so that he goes back to being a good father and good husband, and that's an important outcome.  So there's that aspect.

The other aspect of this case that drove his behavior was his mother was in -- it was two car accidents; is that right?  She was in a car accident, horrible car accident, and then -- I might get this slightly wrong, but then she was in another one.  She ended up being in the hospital for an entire year.  And as her letter points out, he would visit her, you know, once a week, driving a far distance.

So in this case, the agents actually found in the car a number of receipts for hotels, and that came up.  The hotels were right by the hospital where he would go to visit her.  I think it was in Indio.

So she describes, you know, the other aspect of him.  We have the -- you know, the drug-trafficking aspect which brings this case to the Court.  There's also, you know, the son who not only was taking care of his mother, who was in the hospital and needed help financially and emotional support -- she's confined to a wheelchair and can't move her head.  And as she

said in the letter, now she's without her son.  She's trapped

in a wheelchair.  She can't even see her son, and then -- but

he would take care of her.  He would go see her and be her

emotional and financial support.

His father is also in -- has medical needs, and he would

go to the pharmacy for him and buy drugs for him --

pharmaceutical drugs from the drugstore.

And so that's -- that's the other aspect of ███████

that we don't see, you know, if we're just focusing on the

border.  I think that aspect of him along with his -- his --

what I see is a -- is a complete change.

The Court noted that, you know, in the initial proffer of

sessions, he was -- well, in the first part of the proffer of

sessions, it was -- the Court has been there.  You know, it's

aggravating when you bring someone and they are trying to

avoid -- basically, it ends up being trying to minimize and

avoid really accepting responsibility.  It is just part of the

process sometimes unfortunately.

But -- and so that is reflected, and that's before the

Court.  The Court has been made aware of that by the Assistant

U.S. Attorney, but once -- it was a huge break in this case.

Once it started being honest, it was -- I believe it was a

hundred percent honest and that he -- he changed.  I saw him,

you know, physically and emotionally totally changed from being

someone who's, like, "No, no, no, no.  Minimize, minimize,

minimize" to fully accepting responsibility, being honest and

open about everything, and then letting him in AA.

And he's always been a Christian, but he's going to the

School of Christ International Certificate that he has.  You

know, he's been attending that regularly.  He's got three

certificates from them.

He -- I mean, he's said to me again and again when I visit

him that he knows he's looking at a lot of time, but this --

he's glad that he got arrested and that he's been able to stay

clean and think clearly for the first time in a long time.  And

so it is his hope that he can put this case behind him and get

into the RDAP program so that he can get out and be drug- and

alcohol- and marijuana-free for his family.

So that's for me the flip side of this case, is the other

side of ███████ that stands before the Court.

THE COURT:  All right.  ███████, what do you have

to say on your own behalf this morning?

THE DEFENDANT:  I just want to say that I'm sorry for

what I did, and I just want to do my best for myself and then

for my family, for my kids and my wife and for my mom and my

dad.  And I just want to say I'm sorry for what I did.

THE COURT:  All right.  Mr. Casper?

MR. CASPER:  Your Honor, very briefly.

I did want to say first that with respect to what

Mr. Herman said -- Hermansen said about the break in this

defendant and the change, I would concur with his analysis.

      **THE COURT:** But isn't that a problem for you because you really can't use him as a witness; right? Once -- I mean, look, I've been through the same debriefing sessions that you've been through, and one of the things that I used to stress at the beginning is "Don't lie to me because if you foul the footpath from the beginning, you're useless as a witness. We can't use you. I have to reveal that you lied and then changed your story even after you were ostensibly cooperating." And in most cases, that sunk the ship for using a guy.

    I mean, isn't that what happened here?

      **MR. CASPER:** It's -- you know, it's certainly an issue for the Government going forward. We've taken that into account --

      **THE COURT:** I can't imagine --

      **MR. CASPER:** -- in terms of the recommendation.

      **THE COURT:** -- you can use him as a witness in any case or that, you know, any other U.S. Attorney's Office or DA's Office can use him as a witness. I mean, it's -- you know, his record is bad enough.

    And then to say, "Well, after he supposedly came in and, you know, I gave him that speech" -- if I were a defense attorney, I'd probably call you as a witness and say, "Mr. Casper, did you tell him before the session started that he had to tell the truth, that it was incumbent upon him?" I

assume you did that.  And in spite of that, he began by lying

to you, I mean, material lies, not just small things?  I mean,

who's going to credit that guy as a witness in any subsequent

case?

So that's just an observation that I see from, you know,

your declaration.  I just don't see how -- I'm -- as I told

Mr. Hermansen, you know, you're an experienced prosecutor.

You're careful.  I respect your judgment.  You've asked for a

five-point departure here.  I'm going to give it.

You know, whether, in fact, objectively looking at, you

know, what he did, including the lying, justifies that, that's

another question, but I'm going to defer to you on that.  I

just see a different aspect of the ostensible cooperation here.

MR. CASPER:  And I understand and appreciate the

Court's concern, and we did take that into account in the

recommendation that we made.

And with that, Your Honor, we believe, given the

defendant's --

THE COURT:  I have one other question.  I mean, you

mentioned that he came around and said he had done this before.

How many times had he imported methamphetamine?

MR. CASPER:  I don't know, Your Honor, that we got a

specific number.

THE COURT:  Did you ask for one?

MR. CASPER:  I believe we -- we got, you know,

1  "multiple, multiple occasions."  I just --

2         THE COURT:  What does that -- what does that mean?

3  What does that mean to you?

4         MR. CASPER:  I honestly don't recall at this time the

5  exact number that was given.

6         THE COURT:  I'm not going to put you on the spot,

7  Mr. Hermansen, unless you want to volunteer.  I mean, was there

8  ever -- I would think that once a guy says, "Yes, I've done

9  this before," the next logical question in trying to get to the

10 bottom of it to assess his culpability is say, "Well, how many

11 times?"

12        MR. HERMANSEN:  Well, he met --

13        THE COURT:  If you can't remember, well, kind of

14 ballpark it for me.  How many times do you think?

15        MR. HERMANSEN:  Yeah.  It's not many because he met

16 the guy a month and a half before his arrest, and I think it

17 was twice, and --

18        THE COURT:  Twice before, including this one?

19        MR. HERMANSEN:  No.  I think total.

20        THE COURT:  This was the second one?

21        MR. HERMANSEN:  I think so.  And the -- I mean,

22 texts -- you know, we've all had that during a proffer where

23 they're, like, "Oh, here are all your crossings."  So it's --

24        THE COURT:  Right.

25        MR. HERMANSEN:  You know, the agents would have

1  confronted him.

2      **THE COURT:**  We don't know for sure.  You think it's

3  two.

4      And you don't know at all?

5      **MR. CASPER:**  Your Honor, I just -- at this point in

6  time, I just don't recall because it's been a while since, but

7  it was -- it was less than five.  I do recall it was a very

8  limited number.

9      **THE COURT:**  Well, do you have a note or something,

10  Mr. Casper?  I mean, you seem to have some recollection of it.

11  Mr. Hermansen remembers two.  You know, look, it's a material

12  thing if the guy does it five times before or four times before

13  versus once before.

14      **MR. CASPER:**  I believe it was -- I believe there was

15  either one or two prior occasions, Your Honor.

16      **THE COURT:**  All right.

17      **MR. CASPER:**  I don't believe it was more than that.

18      **THE COURT:**  We'll leave it at that.  I -- for my

19  purposes, I'm interested in how many times.

20      So, you know, going forward, you might ask that.  If the

21  guy says, "Yeah, I've done this before," I'd want to know how

22  many times he had done it before.

23      **MR. CASPER:**  And, Your Honor, certainly we asked that,

24  and it may well be recorded in the memorandum, but -- but as we

25  stand here, I just don't have a specific recollection of the

```
 1   number.
 2            THE COURT:  Okay.  Anything else?
 3            MR. CASPER:  No, Your Honor.
 4            THE COURT:  Mr. Hermansen, anything more?
 5            MR. HERMANSEN:  No, Your Honor.
 6            THE COURT:  I mentioned to Mr. Hermansen that the
 7   Ninth Circuit protocol requires that I first correctly
 8   calculate the guidelines and explain the guideline sentence.
 9   This facilitates appellate review of my guideline calculations.
10       Here, I adopt the calculations that are set forth in the
11   Government's sentencing summary chart.  Given the amount of
12   methamphetamine and the Court not finding that the defendant
13   had a minor role in this, the starting offense level is a 38.
14   Because the defendant imported methamphetamine, two points are
15   added pursuant to the guidelines.  So the starting offense
16   level adjusted upward is 40.
17       I do find that the defendant has accepted responsibility,
18   has pled guilty.  No motions were filed in this case.  The
19   Government has moved for the full three points, and that's
20   fully justified here.  The Government has also asked me to
21   depart downward for -- under 5K.  Again, I have read the
22   declarations in support of it.
23       I am going to defer to Mr. Casper.  As I said, I find him
24   to be and have found him to be, you know, a careful and
25   experienced prosecutor.  I may not agree with him entirely on
```

the basis of the showing, but I think it's important that I
defer to him.  He is, after all, a representative of the
executive branch and has a better idea of how helpful the
information is.  So I depart five levels for that.

The Government has also asked for an additional one-level
departure for expedited resolution.  And, again, I think -- and
there were probably things the defendant could have challenged
in this case.  He didn't.  The three points -- maybe he doesn't
fully acknowledge that.  So I have no problem departing an
additional point for that.

So six levels of departure from 40 plus the three points
for acceptance drops this to a 31.  Owing to a long criminal
record, the defendant is in Criminal History Category VI, and
the guideline range is 188 to 235 months.  I'll keep that range
in mind as I reevaluate the case under 3553.

I'm to look at the nature and circumstances and
seriousness of the offense.  This is a very serious offense.
The penalties do speak to the seriousness of it, that the
defendant faces a ten-year mandatory minimum because the Court
did not give a role reduction.  And that being the case, the 5K
did not drop the defendant below the ten-year mandatory minimum
and up to life.  So the penalties alone, I think, demonstrate
the seriousness of the offense.

And looking at the merits, it's a very serious offense,
too.  Here, the defendant was caught with 20 pounds of pure

methamphetamine.  That's an enormous amount of methamphetamine.
I've said this before, I think I'll probably have to say it
again to make the record in these cases, but we get jaded in
these border districts.  I can't imagine another district --
maybe somewhere in Texas, maybe Arizona or New Mexico -- where
they are equally jaded because they see these large amounts,
but I doubt it.  But I think in the majority of the districts,
an amount like this would fetch a much longer sentence.

I have -- and this all goes to the seriousness.  Every
year, the Sentencing Commission publishes an annual report, a
sourcebook on federal sentencing that lays out the average
sentence given per offense.  And for methamphetamine in this
amount -- and I think it's probably way lower.  The threshold
amount is way lower.  It's 4.5 kilos, not -- not eight.  The
average sentence in the United States District Courts is 93
months, 93 months.

Now, obviously, that assumes somebody in Criminal History
Category I as well as somebody in Category VI.  It's a one of
criminal histories.  But it's -- you know, it's a very, very
long period of time, and it reflects, I think, the nature of
this drug and the dangerousness and the consequences of this
drug being distributed in the community.

There are all kinds of ripple effects from dependency and
other crimes committed by other people.  This type of
lawlessness breeds other lawlessness.  There's no question

1   about that in my mind.

2       I also find here -- and I've mentioned this.  I don't want

3   to pound ███████████ on this, but, you know, he didn't see fit

4   to offer any alternative explanation.  I think it was very

5   cynical for him to bring his three-year-old daughter along.  I

6   just think that was awful in this case.  I really do.  I didn't

7   adjust because of that, but I really think it's an aggravated

8   circumstance here.

9       He took the risk that he'd be arrested.  Indeed, he was.

10  I have a feeling his daughter will remember that for the rest

11  of her life, seeing her father hauled off in handcuffs and

12  somebody has to come to the port and pick her up.

13      And was it the mother of the daughter?  I noted she was

14  his girlfriend.  Is that the mother of his daughter, too?

15          **MR. HERMANSEN:**  Yes, Your Honor.

16          **THE COURT:**  Yeah.  So I just think that that's --

17  that's terrible.

18      The Court has considered the history of the defendant and

19  his characteristics.  In this case, you know, that's a very

20  mixed bag.  The defendant has a criminal record that goes back

21  to 2002.  Some of it is minor stuff, not really significant at

22  all, but a lot of it is not.  A lot of it is crimes that I

23  would personally associate with somebody who's got a drug

24  dependency, and the defendant admits that he does.

25      It includes, you know, forgery, theft, disobeying court

orders, a burglary, felony burglary, obtaining credit by
somebody else's -- on somebody else's identity, again, a
forgery.  These things are commonly associated with someone
who's addicted to drugs.  ███████████ admits that he's been
addicted for sometime to methamphetamine.

Now, you point out that he had another motive here.  He
was trying to help his mother and her illness.  And, you know,
maybe that's so, but I don't know if that was the predominant
motive here.  I don't know when the illness began,
Mr. Hermansen, but, you know, it really doesn't explain some of
these other theft-related offenses that look like they're the
byproduct of a drug dependency.

Now, on the other hand, you have provided letters.
There's certainly another side of ███████████.  I don't want to
focus, ███████████, just on the bad things.  I mean, you are
here for sentencing for something very bad, but, you know, your
parents speak of you as a loyal and caring son, and that is
meaningful to me.  I think that's something you should be proud
of.

I looked at the certificates that Mr. Hermansen filed.  I
think, you know, if you keep up with this, you're on your way
to rehabilitation.  I think you should take advantage of the
programs that the Bureau of Prison offers, vocational and
otherwise.  Your lawyer has recommended the RDAP program.  I'm
going to recommend that, too.  You should participate in that.

1    So it's not all bleak, but there is a, you know, very

2    serious criminal record that puts him in the highest criminal

3    history.

4        Need for deterrence.  I think there needs to be a

5    demonstration of consequences here, and I think that both -- in

6    ███████████████ case specifically, he's obviously not been

7    deterred by other criminal justice sentences, including -- I

8    note one for -- I'm not going to say exactly the same offense,

9    but he did have an 11350 that kind of morphed into a felony

10   threatening with intent to terrorize, and it appears it grew

11   out of his drug usage at the time.  I know cocaine was found on

12   him at the time.

13       And I note also that he was -- have you been in a drug

14   program before in connection with any of these sentences that

15   you've done in the past?  Did the Court give you a drug

16   program?

17           **THE DEFENDANT:**  I was on the -- in Behavior Health in

18   Imperial Valley --

19           **THE COURT:**  Okay.

20           **THE DEFENDANT:**  -- for, like --

21       **THE COURT:**  Well, maybe they weren't as complete and

22   comprehensive as the programs the federal government provides.

23   But I do note that he has had the advantage of being given one

24   of those programs, and, you know, apparently it hasn't worked

25   up to this point because he was drug-dependent,

1   methamphetamine-addicted, even at the time of this offense.

2       So I do have some concern about the need to deter him

3   personally as well as provide an example of what happens when

4   you import large amounts of methamphetamine.

5       In terms of promoting respect for the law and just

6   punishment, I think the Government's recommendation at the low

7   end of the guidelines does that. We're not talking about a

8   first-time offender. We're not talking about somebody that

9   hasn't done this very activity before. He's done it before

10   somewhere between one time and what, two or three other times.

11   And, you know, that is a game-changer.

12       Many people come in and say, "Well, this is the first time

13   I did this. I got caught the first time." I'll give

14   ███████████ credit. He finally came around to saying, "That's

15   not me. I've done this before." And I'm concerned and aware

16   of the concern that you probably have, Mr. Hermansen, that, you

17   know, honesty hurts a person.

18       I don't want to punish him for truthful disclosures that,

19   you know, eventually, you know, were kind of teased out of him,

20   and I'm not doing that. But at the same time, it's unrealistic

21   to say a person can admit to doing any kind of wrongdoing and

22   that won't -- that won't form part of the sentencing judgment.

23   It does. It does.

24       So I do find that the Government's recommendation of 188

25   months is a reasonable sentence in light of his criminal

history, the facts of this case, and -- and the 3553 factors.

Now, one thing that is not fully taken into account is what he's done since he's been in custody. As I said, the Court must acknowledge that he's put his best foot forward. I credit the certificates that you have earned while you've been in. You know, you've -- and Mr. Hermansen mentions that even during the debriefings, there was at one point, you know, a change in your attitude. You came around, and you were more forthcoming, he believes truthful.

I have some trouble, ██████████, with the idea that there was any kind of threat involved here. I think that was kind of thrown in at the end. I'm not sure that that -- there was any real threat to you. But -- but I do take notice of the fact that you've got these certificates and that you've been productive and that you've behaved yourself while in custody, and I think some additional consideration is in order.

So the Court will vary an additional eight months from the 188-month recommendation to 180 months total, and I find that that is a reasonable and correct sentence not longer than necessary but long enough to meet the objectives of sentencing goals under the guidelines and 3553 factors.

He faces a supervised release period of at least five years up to life. The Court sets the period at ten years. I set that period in light of his criminal history. He has a criminal history that spans more than ten years.

1    I hope and my aspiration for ██████████ is that he turns

2  his life around during his time in custody, that he comes out,

3  he meets the aspiration that even his counsel has spoken of,

4  being a good father, a good citizen, and that he's productive.

5  But I think it will take more than five years to demonstrate

6  that to the Court at least or have the Court be satisfied that

7  that's verifiable.  So I set ten years as the period of

8  supervised release.

9           **MR. HERMANSEN:**  Your Honor --

10          **THE COURT:**  Pardon me?

11          **MR. HERMANSEN:**  I'm sorry.

12     The PSR says "statutory maximum of five years."

13          **THE COURT:**  Yeah.  That's not correct.  The supervised

14  release period in a case like this is five years to life.

15     Isn't that so, Mr. Casper?

16          **MR. CASPER:**  I believe that's correct.  I'm checking

17  the plea agreement now, Your Honor.

18          **THE COURT:**  It's a mandatory minimum of five,

19  Mr. Hermansen, but I think the statute provides, given the

20  penalties, that he faces up to life of supervised release on

21  this.

22          **MR. CASPER:**  Yes, that's correct, Your Honor.  That is

23  on Page 4 of the plea agreement.

24          **MR. HERMANSEN:**  Correct.

25          **THE COURT:**  Okay.  So the Court sets ten years as the

supervised release period.

Now, as I've said before, if ████████ demonstrates good behavior and he meets the aspirations that we have for him, there's nothing that precludes me from reducing that at some point or modifying it or terminating supervised release. If he get out, puts his best foot forward, demonstrates to me that there's not going to be any more criminality, then I'm happy to incentivize that conduct by telling him I'll reduce it. But that determination can only be made after he has a track record on supervised release of being successful.

In the meantime, here are the conditions of supervised release: He's not to go into Mexico.

You don't have any reason to go down there, do you, ████████?

**THE DEFENDANT:** No.

**THE COURT:** So don't go into Mexico, period. Things like this happen. You'll get somebody who finds out you have a right to cross over and, you know, tempt you. So just stay away from that.

He's to tell the probation officer about all vehicles he owns or drives. He's to participate in a program of drug treatment, including drug-testing. The testing regimen will be three times -- testing regimen will be three times per month for the first year. If there's no dirty tests or missed tests within that time, the probation officer has the discretion to

1    reduce or eliminate the testing regimen.

2         He's to submit to a search of his house and his person and

3    his car and his personal effects by the probation officer at

4    any time.  Also, the Court, viewing his criminal record and the

5    facts of this case, believes some expansion of that condition

6    is warranted.  So I include police.

7         If the police ask to search you, you cannot demand a

8    warrant.  If they show up at your house, you must let them in,

9    let them search, let them look at your car.  That includes

10   state, federal, and local police.  If you think you're being

11   harassed, you call Mr. Hermansen, and I'll put an end to any

12   harassment, but I doubt that's going to happen.

13             **THE DEFENDANT:**  Okay.

14        **THE COURT:**  He is to resolve all outstanding warrants.

15        Are you on that, Mr. Hermansen?  You're going to try to

16   get those things blended?  He's got some outstanding warrants.

17   Are you going to blend it into this sentence so he can do it

18   concurrently?

19             **MR. HERMANSEN:**  Yes, Your Honor, I am on that.

20        **THE COURT:**  Okay.  And he's to maintain full-time

21   employment or schooling or some combination of those things.

22   The Court does not impose a fine.  I do impose a hundred-dollar

23   penalty assessment.  The Court recommends that ███████████ go

24   to a facility where he can participate in the RDAP program.

25        Has Mr. Hermansen explained to you that program?

1    **THE DEFENDANT:**  Yes.

2    **THE COURT:**  500 hours.

3    And I hope, you know, it continues to give you motivation

4    not to get back into drug use once you get out.  But if you

5    complete it, the tangible benefit to you is it cuts another

6    year off the sentence.  One year comes off.

7    **THE DEFENDANT:**  Okay.

8    **THE COURT:**  So I encourage you to participate in that

9    and recommend you for participation, and I think you will be

10   permitted to participate.

11   Any other recommendations regarding placement or anything

12   else, Mr. Hermansen?

13   **MR. HERMANSEN:**  Western Region.

14   **THE COURT:**  Okay.  The Court recommends Western

15   Region.

16   Was there a waiver-of-appeal provision as part of this

17   agreement?

18   **MR. CASPER:**  Yes, Your Honor.

19   **THE COURT:**  Has it been triggered, Mr. Hermansen, by

20   virtue of the below-guideline sentence that I imposed?

21   **MR. HERMANSEN:**  Yes, Your Honor.

22   **THE COURT:**  Okay.  I find the defendant has no right

23   to appeal nor to collaterally attack his conviction in the

24   future.

25   Good luck, ██████████.

1    Mr. Hermansen, one last thing on the sealing motion.  If

2  the circumstances change, if you find that there is some

3  apparent, you know, danger, if he reports to you that there's

4  recrimination or something like that, you're free to bring the

5  motion again and, you know, fill in the blanks and make the

6  showing that I find was not made at this point.  All right?

7          **MR. HERMANSEN:**  Yes, Your Honor.

8          **THE COURT:**  All right.

9          **MR. CASPER:**  Thank you, Your Honor.

10          (Proceedings adjourned at 10:40 a.m.)

```
 1
 2
 3                    CERTIFICATE OF REPORTER

 4           I certify that the foregoing is a correct transcript

 5    from the record of proceedings in the above-entitled matter.

 6

 7    DATE:   Tuesday, June 30, 2015

 8

 9

10

11                    /S/ James C. Pence

12          James C. Pence, RMR, CRR, CSR No. 13059
                      U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```